**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**UNITED STATES OF AMERICA,**

**vs.**                                    **Case No.  5:04cr55-MCR**
                                        **Case No. 5:06cv12-MCR/WCS**

**GREGORY DENIS TRUETTE,**

   **Defendant.**
_____/

## <u>REPORT AND RECOMMENDATION</u>

Pending in this case is an amended motion to vacate and set aside a sentence filed pursuant to 28 U.S.C. § 2255.  Docs. 41 and 59 (supplemental claims).  The United States filed a response, doc. 57, and defendant filed a reply.  Doc. 58.  The Government also filed a response to the supplemental claims, doc. 65, and defendant filed a reply. Doc. 66.  Counsel was appointed for Defendant and an evidentiary hearing took place on March 14, 2008, in Panama City, Florida, as to the claims of ineffective assistance of counsel.  Defendant filed a post-hearing memorandum as final argument, doc. 92, and the Government responded with a memorandum, doc. 93.

**Procedural history**

### The charges

Defendant was charged in a seven-count Indictment with drug, firearms, and explosives offenses.  Doc. 2.  In count 1, Defendant was charged with possession with intent to distribute 5 grams or more of methamphetamine, and in count 2, he was charged with manufacturing 5 grams or more of methamphetamine.  *Id.*, pp. 1-2.  In count 3, Defendant was charged with possession of firearms during and in relation to a drug trafficking crime.  *Id.*, p. 2.  In counts 4 and 6, he was charged with possession of destructive devices during and in relation to a drug trafficking crime, and in counts 5 and 7, he was charged with possession of destructive devices.  *Id.*, p. 2-4.  The Government filed an Enhancement Information pursuant to 21 U.S.C. § 851, seeking increased penalties based on his prior felony convictions.  Doc. 10.

### Defendant's motion to suppress

Defendant filed a motion to suppress, charging that the search of his property and seizure therefrom violated the Fourth Amendment because (1) the probable cause affidavit relied "upon observations . . . that were obtained illegally when the officer trespassed onto the Defendant's property without lawful authority or consent," and (2) even if the officer had authority to "trespass" on Defendant's property and use his observations in the affidavit, "the allegations including those from the affiant's observations at the Defendant's residence still fail to provide sufficient probable cause to believe that the Defendant's residence and surrounding property contained evidence of a crime, contraband, fruits of a crime, or other items illegally procured."  Doc. 11, pp. 1-2.

**The plea colloquy**

Defendant entered guilty pleas to counts 1, 2, 3, 4, and 5 pursuant to a plea agreement.  Docs. 15 (minutes), 16 (plea agreement), and 55 (transcript).  The Government represented that based upon evidence from its expert witness, counts 6 and 7, relating to destructive devices, had to be dismissed regardless of whether guilty pleas were entered as to the other counts.  Doc. 55, p. 2.  The court asked Defendant whether he understood that a hearing on his motion to suppress was scheduled, but that he was proposing to proceed "with a plea as opposed to a hearing on the motion to suppress."  *Id.*, p. 3.  Defendant said he understood.  *Id.*  Defendant's attorney then withdrew the motion to suppress.  *Id.*

The court said:

Mr. Truette, please understand[,] I don't want you to be confused.  I don't want you to answer any question that you are confused about.  So if there is something that you need clarification on, just let me know that.  I'll stop my questioning and do my best to clarify the issue for you.

*Id.*, p. 4.  Defendant said he understood.  *Id.*, p. 5.

Defendant said he had attended three community colleges and was 16 credit hours from an AA and an AS degree.  *Id.*, p. 6.  He had worked seven years as an emergency medical technician and a paramedic.  *Id.*

The court explained that among the constitutional rights that Defendant gave up by pleading guilty was the right to present defenses.  The court said:  "And you will also waive any and all defenses that you might otherwise have to the charges that you now fact, including, for instance, the issues that were raised in your motion to suppress.  Do you understand that?"  *Id.*, pp. 8-9.  Defendant said:  "Yes, Ma'am."  *Id.*, p. 9.

Counsel for Defendant advised the court that he had come early to meet with Defendant, and Defendant had about four hours to review the plea agreement.  *Id.*, p. 11.  Defendant agreed that he had two or three hours to review the agreement.  *Id.*, p. 10.  He said he had read it himself, word for word.  *Id.*, p. 11.  He said he did not need any more time to discuss the plea agreement with his lawyer.  *Id.*

The court explained that due to prior felony drug convictions, Defendant faced a minimum mandatory 10 year prison sentence and a maximum of life imprisonment for both counts 1 and 2.  *Id.*, pp. 12-13.

The court explained that with respect to count 3, Defendant faced a sentence from a minimum mandatory term of five years to a term of life imprisonment.  *Id.*, p. 13.  The court explained: "[A]nd also, importantly, that five year term of imprisonment, the minimum mandatory must be served consecutively to any sentence imposed in Counts 1 or 2.  *Id.*, p. 13.  Defendant said he understood.  *Id.*, p. 14.

The court explained to Defendant that he faced a minimum mandatory 30 year term to a maximum term of life imprisonment for count 4, that "must be served consecutive to the sentences imposed in Counts 1 and 2."  *Id.*, p. 14.  Defendant said he understood.  *Id.*

**The plea agreement**

In the plea agreement, Defendant agreed to enter guilty pleas to counts 1, 2, 3, 4, and 5.  Doc. 16, p. 2.  He was advised that the minimum sentence for counts 1 and 2 was 10 years due to his prior felony drug convictions as set forth in the Notice of Enhancement.  *Id.*, pp. 2-3.  Defendant was advised that the minimum sentence for count 3 was a 5 year sentence that had to be served consecutive to the sentences for

counts 1 and 2.  *Id.*, p. 3.  Defendant was advised that the minimum sentence for count 4 was 30 years in prison, that must be served consecutively to any sentence imposed for counts 1 and 2.  *Id.*, p. 4.  Finally, Defendant was advised that the sentence for count 5[1] was a maximum term of 10 years, with no minimum.  *Id.*  The plea agreement did not advise Defendant that the sentence for count 3 (5 years minimum) and count 4 (30 years minimum) must be served consecutive to each other nor did the plea agreement advise that they could be served concurrent with one another.

The plea agreement contained a factual basis for the plea and stated: "Defendant acknowledges the truthfulness of the following factual basis for his guilty plea."  *Id.*, p. 15.  He admitted that he manufactured more than 5 grams of methamphetamine that was found in his "automobile."  *Id.*  He admitted that the methamphetamine was "packaged *for distribution* in small individual heat-sealed plastic bags."  *Id.*, p. 16 (emphasis added).

### Sentencing

On April 6, 2005, Defendant was sentenced to 10 year terms (120 months) on counts 1, 2, and 5, to run concurrently to each other; to 5 years (60 months) as to count 3, to run consecutively to the 10 year terms; and 30 years (360 months) as to count 4, to run consecutively to the 10 year terms and consecutively to the 5 year sentence for count 3.  The cumulative sentence is 45 years.  Docs. 24 (minutes) and 25 (judgment).

---

[1] At this place in the plea agreement, count 5 was initially identified as such but then the passage erroneously referred to this count as count 4.  In context, however, it was clear that count 5 was intended.

**Evidence from the evidentiary hearing**

**Gregory Truette**

Defendant testified that he graduated from high school and went to college for several years, and then became an emergency medical technician.  Doc. 90 (transcript), p. 6.[2]

Defendant said he then was arrested for involvement with marijuana, but was unsure if it was a possession or cultivation charge.  *Id.*  He was on probation from this when he was arrested in possession of "an empty baggy with some [cocaine] residue in it" in a "work truck" "used by various people."  *Id.*  That charge, and the violation of probation, resulted in two years of house arrest community control and three years of probation.  *Id.*, p. 8.  While on probation, a urine test came back positive for methamphetamine and Ecstasy, and Defendant told his probation officer, "no way."  *Id.* He was tested again, and was positive for methamphetamine, but Defendant "still disputed it."  *Id.*  Defendant said that he was never retested, but "then all of a sudden one day I'm coming back home and a police officer pulls me over [on August 17, 2004]." *Id.*  He said that the positive drug test had been "four or five months prior."[3]  *Id.*, p. 11. Officer Hutching had a warrant for Defendant's arrest for violation of probation and he recognized Defendant.  *Id.*, p. 9.

Defendant said that contraband was found as a result of this stop.  Defendant explained that methamphetamine and a methamphetamine smoking device were found

_____

[2] The pages of the transcript, doc. 90, correspond exactly with the pagination assigned by the electronic docket.

[3] It was on April 29, 2004, three and one-half months earlier.  G. Ex. 1.

under the seat.  *Id.*, pp. 9-10.  Defendant said at that time he was"a very high user" (despite the fact that he expressed such surprise at the positive drug test conducted by his probation officer).  *Id.*, p. 10.  Defendant said that Sergeant Hutching "located a key somewhere inside my truck *that I forgot was there*, and he unlocked it [the tool box in the truck bed] himself."  *Id.* (emphasis added).  Inside the tool box were "individual packets" that Defendant said were his "personal hits."  *Id.*  Defendant explained:

> If I was ever in midst of other company, I wouldn't want to carry amount – any large amounts or whatever, because I don't share with nobody, I don't want to – it's mine. . . .  So I take individual hits with me whenever I might be out in the presence of a lot of people.

*Id.*, p. 11.  Defendant said he did not ever sell methamphetamine.  *Id.*

Defendant said that at the time of the stop by Sergeant Hutching, Defendant had Karen Swanberg's child with him.  *Id.*, p. 11.  Swanberg was in Biloxi.  *Id.*  Defendant told Sergeant Hutching that the child's "parents were out of state."  *Id.*  Hutching told Defendant he was going to jail.  *Id.*, p. 12.  Sergeant Hutching tried to contact Swanberg using Defendant's telephone.  *Id.*, p. 13.  Hutching knew Defendant's uncle, who was the EMS Director for the county (Washington County), and he asked Defendant if his Uncle Randall could come get the child.  *Id.*, p. 12.  He contacted Defendant's uncle on his two-way radio and he and Defendant's aunt came and picked up the child.  *Id.*, p. 13.

The pivotal issue of for Defendant's claim to a viable motion to suppress the evidence taken from his home is his contention that Sergeant Hutching had no reason to go to his home.  *Id.*, pp. 133-134.  Defendant testified that Hutching arrested him 20 miles from his house and took him to jail and booked him.  *Id.*, p. 134.  Defendant

contends that in his arrest report, Hutching said he went to Defendant's home to locate Swanberg, the mother of the child.  *Id*.  Defendant said he later found out that Sergeant Hutching had already had contact with Ms. Swanberg, she had given permission for the child to Defendant's uncle and aunt and had done so.  *Id*.

Government's exhibit 1 is the warrant for Defendant's arrest dated May 12, 2004, for violation of probation.  Defendant was in arrears on payments toward the cost of supervision and tested positive for methamphetamine on April 29, 2004.  G. Ex. 1.  The report of the arrest on August 17, 2004, was not submitted as evidence at the hearing. Defendant's testimony is not competent evidence as to what is in the arrest report.

Sergeant Greg Hutching of the Washington County Sheriff's office executed an affidavit for a search of Defendant's home on August 18, 2004.  D. Ex. 1.  Sergeant Hutching states in his affidavit that on August 17, 2004, he stopped Defendant because he knew Defendant and knew he was wanted on a warrant.  *Id*.  A search of Defendant's person revealed a suspected marijuana cigarette.  *Id*.  A search of the passenger compartment incident to the arrest revealed a container containing suspected methamphetamine and a methamphetamine pipe.  *Id*.  Also in the passenger compartment were two packages and a bottle of pseudoephedrine, used to manufacture methamphetamine.  *Id*.  In the locked tool box in the bed of the truck were found 16 heat-sealed plastic packages of methamphetamine.  *Id*.  The truck was registered to and owned by Defendant.  *Id*.  The suspected methamphetamine field tested positive. *Id*.  Sergeant Hutching further said (incorrectly) that Defendant was on probation for possession of methamphetamine with intent to sell, and said (correctly) he "was under a positive urinalysis for methamphetamine."  *Id*.  Sergeant Hutching said that about an

hour and one-half after the traffic stop, he "responded" to Defendant's residence and "immediately" smelled a "chemical clean" odor.  *Id.*  Sergeant Hutching did not state in the affidavit to obtain the search warrant that he went to Defendant's home to try to find Karen Swanberg.  Sergeant Hutching said that the strong odor was noted on the side of the residence where Hutching had parked.  *Id.*  He said he observed "what appeared to be an electronic scale lying on an end table by the couch that was clearly visible from the window containing the window unit," and the scale was "consistent with" what Hutching has previously seen used to weigh illegal narcotics.  *Id.*  Two clear plastic jugs containing an unknown liquid, and one jug containing denatured alcohol (used to manufacture methamphetamine) were found in a small shed by the back side corner of the dwelling.  *Id.*

Defendant admitted that he was manufacturing methamphetamine at his home, but insists it was only for personal use, "so I could try to stay out of trouble."  *Id.*, p. 20. He said he lived alone, so there would be no other cars at his house, and he said that what Sergeant Hutching thought was a digital scale on his coffee table was a calculator. *Id.*

The presentence report, which the court adopted at sentencing, states that the search of Defendant's home resulted in the seizure of the following evidence: "dehydrator machines with Pyrex plates inside, a heat sealing device, *an electronic scale*, muriatic acid, denatured alcohol, and a plastic bottle containing white powder separating from a clear liquid."  PSR, ¶ 14 (emphasis added).

Defendant retained Waylon Graham, Esq., as his attorney on August 27, 2004.[4]
*Id.*, p. 24.  An ATF agent came to the jail to interview Defendant, and told him that "he
found some bombs or something at my house.  It was so far back."  *Id.*, p. 26.  As noted
ahead, 29 explosive devices were found.  *Id.*, p. 116.  Defendant testified that he did not
discuss the case with the ATF agent, and told him he wanted his lawyer present.  *Id.*

Defendant said he did not see his lawyer again until the day of the motion to
suppress hearing, on December 3, 2004, which also was the day he entered his guilty
plea.  *Id.*, p. 27.  Defendant denied seeing Graham at any time between August 27,
2004, and December 3, 2004, but had "some phone correspondence with him," three or
four times.  *Id.*, p., 28.  Defendant "relayed" most of his information back and forth to
Graham through Karen Swanberg.  *Id.*  Defendant said that the time he spent with
Graham, "[m]e and him together, total, back and forth, tops, I would probably say an
hour, hour and a half, tops."  *Id.*, pp. 52-53.

Defendant said that Graham told him that he faced a minimum mandatory 10
year prison term for the methamphetamine in the truck, and that he would be convicted
of that charge.  *Id.*, pp. 31-32.  Graham planned to file a motion to suppress the
evidence seized from the house.  *Id.*, p. 31.  Defendant says he told Graham that he
never sold any methamphetamine, but Graham told him that from what the officers had
(the amount of methamphetamine), it did not appear that he was not selling.  *Id.*, p. 32.
Graham told Defendant he had better help himself by cooperating.  *Id.*

---

[4] Defendant has argued that Graham was hired on November 1, 2004, only 32
days before his guilty plea.  Doc. 58, pp. 1 and 7.  This is not correct.  November 1,
2004, is the date Graham entered his appearance in this case.  He had been retained
months earlier in the state case.

Defendant said that on December 3, 2004, he was transported to the federal court house for the hearing on the motion to suppress. *Id.*, p. 42. Graham told him at that time that he had read the Government's response to the motion, and said that he could not win the motion to suppress. *Id.*, p. 43. Graham cited <u>Leon v. United States</u>, and told Defendant that if an officer is in an area with good intentions, observations he makes can be used against the Defendant. *Id.* Defendant argued that Officer Hutching did not have a right to be at his house in the first place. *Id.*, p. 44. Graham again said that the plain view doctrine would prevail, but he said that the good news was that if he pleaded guilty, the maximum sentence he would receive would be 30 years, but the more likely sentence would be 15 to 18 years. *Id.* When Defendant told Graham that even 15 years was too long, Graham said that with Ms. Swanberg helping with cooperation, it was "more than likely you can get that dropped down even further." *Id.*, p. 45. Defendant said that Graham told him that there would be no plea deal if he persisted with the motion to suppress, and that if Defendant "took this trial, he [Graham] said he promised that I would get life." *Id.* and p. 139.

Defendant said that at this point, Graham showed him the plea agreement. *Id.*, p. 47. He told him to "look it over," and he would be back to talk about it. *Id.* Defendant said that a lot of the plea agreement was not understandable. *Id.*, p. 48. Defendant said that at this point, he had not seen the Government's notice of enhancement, and he says he did not see it until he got to prison. *Id.* The notice of enhancement was filed on November 17, 2004, showing a copy sent to Graham. Doc. 10. Defendant asserts that Graham never explained to him how the enhancement would work. *Id.*, p. 49. He also asserts that Graham never explained the plea agreement to him, but simply told

him that if he did not sign the plea agreement, "any cooperation was out the window,

that, you know, I was basically going to face life."  *Id.*

Defendant said that each charge had a minimum mandatory, "a ten, a five and a

30, something along that line."  *Id.*, p. 50.  Defendant said Graham told him that the

sentencing guidelines did not count.  *Id.*, p. 51.  Defendant reiterated that Graham told

him that the maximum sentence would be 30 years.  *Id.*  Defendant said that Graham

never told him that he was facing a certain minimum mandatory sentence of 45 years.

*Id.*  At another point, however, when asked if he knew anything about sentences

running concurrently and consecutively, Defendant said:

> Yeah, but I was kind of confused about it.  But I understood that some of
> them couldn't be ran together.  I was under the impression that 30 years
> was the minimum mandatory, but I kind of – I want to – it's so far back. I
> kind of – at some point – was very confused.  At some point I thought 30
> years would have been the minimum mandatory because that was the
> highest one and they would all be – I guess you call it  concurrent.
>
> *And then I understood that the guns couldn't be run concurrent with the
> drugs, so I started thinking 35, and then at some point I did think that
> maybe 45 would be the minimum mandatory.*  But being that I already
> started cooperating, I really didn't consider it a possibility anymore,
> according to what I was being led to believe.

*Id.*, pp. 54-55 (emphasis added).  Defendant said that he believed, but was not really

sure, that the judge told him that the total sentence the court was obligated to impose

was 45 years.  *Id.*, p. 55.

Defendant acknowledged that during the plea colloquy, he told the court that he

had had two or three hours to look over the plea agreement that day.  *Id.*, p. 70.  He

denied that he had four hours with the plea agreement, as Graham had represented to

the court.  *Id.*, pp. 70-71.  At the § 2255 hearing he said he had the document 30 minutes, "45 minutes tops, maybe."  *Id.*, p. 71.

When asked if he would have entered this guilty plea and waived his right to a suppression hearing if he had known that 45 years was the minimum prison sentence absent a "5K1," he responded:  "Absolutely not.  That's equivalent to a life sentence for me."  *Id.*, p. 72.  On cross examination, Defendant was asked whether he would have entered his guilty plea for a sentence of 40 years, and he said he still would have gone to trial if he was going to get a 30 year sentence.  *Id.*, p. 118.

During the plea colloquy, the prosecutor said that he did not think Defendant should enter a guilty plea if he contended that he did not possess the methamphetamine with intent to sell.  At this point, Defendant said, attorney Graham "turned his head and whispered in my ear, he said, 'If you don't stop this, she's not going to accept your plea and you will get life.' "  *Id.*, p. 89.  It was at that point, said Defendant, that he told the court that if he had run into someone who wanted some methamphetamine, he would have "gotten rid of some of it."  *Id.*  He said that at this point, he was just trying to save his plea.  *Id.*  He then said:  "I guess I'm greedy, or whatever, but I don't sell drugs."  *Id.*

Defendant acknowledged that at sentencing, the court told him that upon his request, the clerk of court would file a notice of appeal immediately for him.  *Id.*, p. 102.  He said he fully understood that he had only 10 days to appeal.  *Id.*, p. 104.

Defendant said that one of the reasons he wanted to appeal was that he did not receive the sentence that was promised to him.  *Id.*, p. 104.  Another reason was that he believed that he could not be enhanced for sentencing purposes for a misdemeanor of

possession of a controlled substance.  *Id.*, p. 106.  Defendant said that "immediately after court that day I told him [Graham] I wanted to appeal it."  *Id.*, p. 102.  Defendant said that Graham told him that he would discuss it later.  *Id.*

Defendant said that he then called Ms. Swanberg and asked her to tell Graham that he wanted to file an appeal.  *Id.*  She said "Okay."  *Id.*  On January 28, 2005, several months before sentencing (on April 6, 2005), Defendant gave Ms. Swanberg a full durable power of attorney.  *Id.*, p. 105; D. Ex. 5.  Defendant depended on Swanberg to speak to his attorney.  *Id.*, pp. 105-106.

Defendant said that he telephoned Graham, probably the next business day, and told him to file an appeal.  *Id.*, p. 103 and 136.  Graham said, "there's no illegal sentence," "there's no grounds for appeal."  *Id.*, p. 103.  Defendant said, "what about the amount of time you promised me," and Graham said it was not an illegal sentence, but he still had a Rule 35 he might get.  *Id.*  Defendant asserts that he told Graham he still wanted to file an appeal, but Graham repeated that it was not an illegal sentence.  *Id.*  Defendant said, "that's pretty much where he left it."  *Id.*

Thus, according to Defendant, Defendant asked his lawyer to file an appeal and he refused.  *Id.*  Defendant acknowledged that Graham had not agreed to handle the merits of an appeal, but "at least he had to file it."  *Id.*, p. 106.

Defendant said he did not know what witnesses his attorney spoke to, and he said his attorney "didn't inform me of anything."  *Id.*, pp. 132-133.  Defendant said he never saw the expert reports obtained by the Government with respect to the explosive devices they found at his home.  *Id.*, p. 116.  Twenty-nine explosive devices were found, but only two explosive devices were charged.  *Id.*

On cross examination, Defendant was confronted with the two occasions during the plea colloquy when the prosecutor, Mr. Knight, stopped the proceedings and told the court that the case should go to trial. *Id.*, p. 119. He admitted that that did not sound like the Government was "trying to rush the plea through." *Id.* Defendant admitted he was given the opportunity to tell the court about a secret promise that his sentence would be not more than 30 years, but he did not. *Id.*, pp. 122-123. Defendant agreed that "technically" he was provided that opportunity. *Id.*, p. 131.

**Karen Swanberg**

Ms. Swanberg testified that she has known Defendant for 19 years and they are engaged to be married. *Id.*, p. 141. She has his durable power of attorney, and her role was to be liaison with Defendant's attorney, Mr. Graham. *Id.* Swanberg said that she and Defendant had trouble receiving responses from Graham and his office. *Id.*, p. 144.

Swanberg said that she was in Biloxi when Defendant was stopped. *Id.* She received voice mails from Deputy Hutching to call Defendant's cellphone "in reference to my child." *Id.*, p. 142. About 40 minutes after receiving this voice mail, Swanberg said she spoke with Sergeant Hutching. *Id.* Hutching asked Swanberg if her daughter could be released to Defendant's family members (his uncle and aunt), and Swanberg told Hutching that that would be okay. *Id.* She said she would return from Biloxi "as soon as I could." *Id.* It was a three or four hour drive back. *Id.*, p. 143. Swanberg said that at that time, she did not live with Defendant. *Id.*, p. 143. She lived in Sneads, Florida. *Id.* When she returned, she got her child. *Id.* Swanberg said that she was never interviewed by Graham about her telephone conversation with Sergeant Hutching. *Id.*, p. 153.

Swanberg attended the hearing on the motion to suppress. *Id.*, p. 145. Graham told her that the motion to suppress was "no good," that Defendant should take the plea offer, and that if he pursued the motion to suppress, the Government would withdraw the plea offer and Defendant would be sentenced to life in prison. *Id.*, pp. 145-146. Swanberg said that Defendant was "basically looking at there would be 30 years mandatory," but it would be less with cooperation and would be approximately 15 to 18 years with cooperation and a "5k and the Rule 35." *Id.* She said that Graham told her that the absolute minimum sentence was 30 years, not 45 years. *Id.*, p. 151. On cross examination, Swanberg said that Graham told her that the sentence would be "thirty years *maximum*" if Defendant did not provide substantial assistance. *Id.*, p. 166 (emphasis added).

Swanberg said that Graham told her that if she did the things that the DEA and others wanted done with information supplied by Defendant, Defendant would get "time off for that." *Id.*, p. 147. She herself had no criminal history, is disabled (in a wheelchair and wears a prosthetic lower limb due to loss of a leg below the knee), does not use drugs, and knows nothing about the drug business. *Id.*, pp. 147-148. She said that the people on the list were "really dangerous." *Id.*, p. 148. She understood that Mr. Knight knew about her work for Defendant and "we had the green light basically from him for me to do this since Greg Truette was not going to be released." *Id.*, p. 149. Ms. Swanberg made four recorded purchases of methamphetamine as instructed by law enforcement. *Id.*, pp. 150-151. This work occurred after the plea. *Id.*, p. 151.

Swanberg said that after sentencing, she called Julie Miller in Graham's office, and Miller told her it was not an illegal sentence. *Id.*, p. 155. Swanberg reasoned, why

would anyone plead to 45 years?  *Id.*  Miller told her that Graham would have to take care of it.  *Id.*  Defendant told Swanberg that he definitely wanted to appeal.  *Id.*  Swanberg then called Miller and told her that Defendant wanted Graham to file a notice of appeal.  *Id.*  She said that she also told Graham this, and Graham said he would have to call Defendant back, that it was not an illegal sentence.  *Id.*, p. 156.  Swanberg said she called 8 or 10 times in the first week after sentencing, and talked with Julie Miller mostly; she talked with Graham one time.  *Id.*, p. 158.  She also understood that Graham would not handle an appeal, but had a duty to file an appeal when requested to do so.  *Id.*, p. 159.

Swanberg testified that Graham told her that arrests had been made based upon her cooperation, and "we were still working with the law enforcement."  *Id.*, p. 160.  She said that after the ten days to appeal had expired, she wrote Graham three times asking why he did not file an appeal for Defendant.  *Id.*, p. 161.  Her letters, she said, were not in Defendant's file when she got a copy of the file.  *Id.*

Swanberg said she had copies of the letters, and emailed them to "Ms. Linda." *Id.*, p. 162.  Thomas Edwards, counsel for Defendant for this § 2255 hearing, was then granted permission to supplement the record when he found those copies of Ms. Swanberg's letters to Graham.  *Id.*  Edwards said his office had the copies of the letters, but he did not have them with him.  *Id.*, p. 163.  I left the matter for the parties to work out.  *Id.*  Mr. Edwards has not produced the letters.

### Randall Truette

Randall Truette, Defendant's uncle, is the Director of Washington County EMS, and has been employed with that agency for 33 years.  *Id.*, p. 168.  He and his wife

came to the scene of Defendant's arrest.  *Id.*, p. 169.  Sergeant Hutching asked if they

would take the baby and they said they would.  *Id.*  They proceeded to call "the child's

mother" to get her permission.  *Id.*  He said that the mother (Swanberg) told both him

and Sergeant Hutching that she was in Mississippi, that it was okay for her child to go

with him and his wife, and that she was "en route to her house."  *Id.*, pp. 169-170.

Randall Truette said that Hutching understood this.  *Id.*, p. 170.  He and his wife left with

the child and Defendant's vehicle.  *Id.*

**Mina Truette**

Mina Truette, Defendant's aunt, was present at the scene of the arrest and had

no involvement in the telephone conversation with Swanberg, but she observed

Hutching talking to Swanberg on the phone.  *Id.*, p. 174.  After that conversation, the

child was released to them and they left with her.  *Id.*

**Waylon Graham**

Waylon Graham, Defendant's attorney, began his legal practice with the state

attorney in 1986.  *Id.*, p. 175.  Since 1988, he has practiced as a criminal defense

attorney.  *Id.*, pp. 175-176.

Graham said that the United States Attorney for the Northern District of Florida

never makes a promise for a specific sentence.  *Id.*, p. 177.  Graham said that he,

therefore, has never promised a particular sentence to a client in federal court in this

district.  *Id.*  The state system is different, he said, and there can be a promise for a

particular sentence as long as it is approved by the judge.  *Id.*, p. 178.  Graham said

that he never told Defendant that the longest sentence he would receive would be 30

years.  *Id.*  He said: "In fact, I made it crystal clear to him that his maximum exposure –

or minimum – or maximum/minimum exposures was 45 years." *Id.* Graham said that

the plea agreement explained this. *Id.* Graham said he never told either Defendant or

Ms. Swanberg that Defendant would get a 30 year sentence, or a 15 or a 14 year

sentence, either. *Id.*, p. 284. He insisted: "That never happened." *Id.*

Graham knew that Defendant had been arrested on a violation of probation

charge, had an underlying drug charge, and was not surprised when the prosecutor in

this case filed an "851" notice of sentence enhancement. *Id.*, pp. 191-192. He said that

he explained the sentence enhancement to Defendant. *Id.*, p. 192.

Graham testified that he thought the motion to suppress was a weak motion. *Id.*,

R. 179. He said that when he got to Pensacola on the morning of the hearing on the

motion to suppress, Mr. Knight, the AUSA, had "numerous law enforcement officers"

there for the hearing. *Id.*, p. 180. Graham had the chance to talk with all of them that

morning. *Id.* The officers supported the arguments made by Knight in response to the

motion to suppress. *Id.* Graham explained:

> [T]he cops have got the right to walk up to your front door and knock on
> the door if they want to. There's nothing to prohibit them from doing that.
> And Mr. Truette's property was not fenced off with a fence, or chain link
> fence, or anything like that, with no trespassing signs and guard dogs.

*Id.*, p. 233. As to this, said Graham, he was relying upon what Defendant told him about

his property. *Id.*, p. 234. Graham also explained that he thought there was case law

that found it appropriate for an officer to go around to the back door if no one came to

the front door after knocking. *Id.*, pp. 235-236.

Graham said that he knew from Ms. Swanberg that she believed that Sergeant

Hutching had no reason to go to Defendant's house because he had talked with her by

telephone. *Id.* He also talked with the officers who were involved in the case. *Id.* Graham said he knew all of the "cops in Chipley," and could talk with them. *Id.*, p. 205. The stop, said Graham, was simple without any legal problem because Sergeant Hutching recognized Defendant and there was an outstanding VOP warrant. *Id.*, p. 206. Graham also said that Swanberg told him that periodically she stayed with Defendant in his residence. *Id.*, pp. 230-231. Graham said that he did not think that Swanberg's evidence was useful at all. *Id.*, p. 195. He said he talked with Sergeant Hutching and Hutching "vigorously denied that he had talked to either" Swanberg or to Defendant's mother before going to Defendant's house. *Id.* and p. 223.

Graham was aware that the affidavit for the search incorrectly stated that Defendant had previously been convicted of a methamphetamine offense and was on probation for a conviction for that offense. *Id.*, pp. 219-220. Graham explained that the arrest records of Defendant in 1999 or 2000 showed that that they "actually found methamphetamine," so "methamphetamine was involved in the previous arrest."[5] *Id.* Graham said that Sergeant Hutching may have known this either because he was involved or because he worked for a small sheriff's office. *Id.*, p. 220. Graham agreed that Defendant was on probation for marijuana and cocaine, not for methamphetamine. *Id.*, p. 221. Graham did not think this misstatement in the affidavit for the search warrant was a "big deal" since methamphetamine use by Defendant was the basis for the arrest warrant, and, when Defendant was arrested, methamphetamine was found in his truck. *Id.*

---

[5] This assertion has not been substantiated by any such arrest records or any testimony from an arresting officer.

Graham said he also knew at that time that he and Defendant had been talking about the possibility of cooperating.  *Id.*, p. 180.  Defendant said he knew of someone who had been smuggling an explosive device from Eglin Air Force Base.  *Id.*  Graham told law enforcement officers, and "they were all interested in that."  *Id.*  The result was "we decided to enter into a plea and cooperation agreement."  *Id.*  Graham said he told Defendant that cooperation was the only way around the minimum mandatory sentences, and that otherwise "we were not going to get around the 45 years."  *Id.*, p. 181.  He said: "So we entered into that agreement with the hope that his assistance would rise to the level of substantial assistance, earn a 5K1 and then get a reduced sentence."  *Id.*  That understanding is in the plea agreement.  *Id.*, pp. 181-182.  Graham explained in part as to why he abandoned the motion to suppress:

> Well, if we were going to enter into a plea and cooperation agreement, I did not want to go forward and alienate the officers that we were going to be working with on a motion that I didn't think we could win.  Because *these were the same officers* that I was going to try to cajole, persuade and encourage to persuade Mr. Knight to give this man a 5K1 letter.

*Id.*, p. 247 (emphasis added).

Graham said he "literally spent two or three hours with Mr. Truette that morning."  *Id.*, pp. 182-183.  "We went over the plea waiver form in great detail, answered all his questions in great detail.  We then broke for lunch.  I gave him the plea waiver form . . . [and] [t]old him to read it again and go over it again."  *Id.*, p. 183.  Graham said that Defendant, therefore, had the plea agreement for about four hours before the plea colloquy.  *Id.*  He had it for "a whole hour" by himself.  *Id.*, p. 184.  The plea colloquy began at 1:30 p.m. that afternoon.  Doc. 15.

Graham said that he discussed the motion to suppress with Defendant, and Defendant agreed not to pursue it.  *Id.*, p. 183.  Graham said that Defendant understood also that the chances at trial "would be very difficult.  The evidence was overwhelming in this case."  *Id.*  Defendant had a "checkered" past, and similar fact evidence might come in that Defendant had set up fish hooks as booby traps around his property.  *Id.*  Graham testified:  "We knew that the cooperation was the only way around the minimum mandatories, he understood that, we wanted to do that, and he agreed with my strategy that we withdraw our motion and do our best to earn a 5K1."  *Id.*, pp. 183-184.  Graham thought that Defendant understood the consequences of his plea.  *Id.*, p. 185.  He said:  "One thing I learned with Mr. Truette, Mr. Truette is no dummy.  He was very bright."  *Id.*  Graham denied telling Defendant that he would be sentenced to life imprisonment if he did not plead guilty.  *Id.*, p. 196.

Graham said he told Defendant that the Government was going to dismiss counts 6 and 7 (which alleged involvement with an explosive device) because the expert report did not support those counts.  *Id.*, pp. 252, 256.  Graham did not remember telling Defendant that dismissal of these counts was part of a plea offer.  *Id.*, p. 256.  Graham said he saw that expert report and had a copy.  *Id.*, pp. 252-253.  The report concluded that there was not enough evidence to show that the device that was the subject of counts 6 and 7 was an explosive device.  *Id.*, p. 253.

Counsel for the Government then proffered that twenty-nine different pipe bombs were discovered at Defendant's home.  *Id.*, p. 254.  Some were not charged as offenses because of where they were found.  *Id.*  Some of the pipe bombs (like the one charged in counts 6 and 7) were exploded in place.  *Id.*, p. 225.  Counsel for the Government

explained that the expert did not recover enough material from the counts 6 and 7 device to determine if it was a destructive device.  *Id.*, p. 255.  Counsel said that he did not believe there was a written expert report stating this, however.  *Id.*  After that proffer, Graham said he had a report analyzing "these devices," and "there may have been more than one report."  *Id.*, pp. 255-256.

Graham said that he and Defendant "discussed about all the bombs that he had up at his property at numerous times."  *Id.*, p. 256.  When asked whether the fact that the expert could not say that the device that was the subject of counts 6 and 7 gave Graham "pause about counts 4 and 5," Graham said no, "[b]ecause Mr. Truette had told me that he built these devices" and there were "sufficient items there that the analyst could analyze."  *Id.*, p. 257.  Defendant did tell Graham, however, that the two devices were "basically identical."  *Id.*  The problem though, said Graham, is that the device in counts 6 and 7 "had been blown up."  *Id.* and p. 260.  Graham did not conduct an independent examination of the reason that counts 6 and 7 were dismissed because he did not "believe that Mr. Knight would intentionally mislead me."  *Id.*, p. 261.

Graham said that an agent told him that the explosive device at issue in counts 4 and 5 was in a closet and was painted the same color as the wall.  *Id.*, pp. 273-274.  It was designed, said Graham, so that Defendant could run into the closet, go down the trap door underneath, close it up, and when someone opened the closet door, Defendant could touch the wires to the batteries under the trap door and the "device would explode into the face of whoever opened the door."  *Id.*  The explosive devices counts, said Graham, were "far and away" the most serious facing Defendant.  *Id.*, p. 274.

Graham denied that he told Defendant during the plea, at the point that Defendant began to equivocate, that "if he kept it up, that the judge wasn't going to accept his plea and he was going to get life." *Id.*, p. 267.

After the plea, Defendant began to cooperate and there were several meetings with law enforcement officers at the Jackson County Jail. *Id.*, p. 185. There came a time, said Graham, that it did not look like all of the cooperation efforts would be completed by sentencing, and that a Rule 35 would be needed. *Id.*, p. 186.

Graham said he talked with Defendant on the telephone "many times." *Id.* He said that if he was not there, his paralegal would talk to his clients. *Id.* Graham said that the assertion that he met with Defendant only one and one-half hours was absolutely not true, that on the day of the plea, he met with Defendant for three or four hours. *Id.*, pp. 186-187. He said that prior to the plea, he met with Defendant "numerous times while he was in jail." *Id.*, p. 187. "I went to Jackson County to see him numerous times, and anytime they had him down there in this jail, I would go to see him numerous times." *Id.* He thought that he had seen Defendant six to eight times between August and December. *Id.*, p. 210. Graham also said that before and after sentencing, he was with Defendant during the "debriefings" (efforts to cooperate) that "usually lasted hours." *Id.*, p. 187. Graham said that in addition, either Defendant or Karen Swanberg called him at least once a week. *Id.*, p. 188. Graham had no written records in his file to substantiate his visits with Defendant. *Id.*, p. 200.

Graham said that at the time of sentencing, he did not have any discussions in court with Defendant about whether to appeal. *Id.*, p. 188. He said there was no point in discussing whether to appeal because there were no issues to appeal. *Id.* He said

that a day or two after sentencing, his paralegal "came in the office and explained to me that Ms. Swanberg was on the phone and she wanted us to file an appeal."  *Id.*, p. 189. Graham told his paralegal that she was not his client, and to have Defendant call him immediately.  *Id.*

An hour later, Defendant spoke with Graham.  *Id.*  Graham said he explained to Defendant that there were no grounds to appeal.  *Id.*  Graham said:  "After we talked about this for approximately 30 minutes, Mr. Truette agreed and understood that there was no issues [sic] to be raise on appeal."  *Id.* and p. 288.  Graham said that after this:

> We talked about continuing to cooperate.  He wanted me to continue to work with Robert Duncan and Delane Finch and basically bug the hell out of them and see if I could keep going on this and see if they would develop something.

*Id.*  Graham denied that Defendant had complained at that time, relative to an appeal, that he had been promised a maximum sentence of 30 years maximum, with 15 to 16 years more likely.  *Id.*, p. 285.  Graham said that when the telephone conversation turned to Defendant's efforts to cooperate, the whole strategy of entering a guilty plea was to "try to save him from those mandatory minimums."  *Id.*, p. 193.  Graham said he made it "crystal clear to him that if we didn't get the 5K1, he was going to get 45 years." *Id.*, p. 251, 185-186.

Graham said that at no point did Defendant tell him to file an appeal even though there were no issues to appeal.  *Id.*, p. 190.  Graham said:  "Again, Mr. Knight, I'm not a stupid man.  If a client point blank instructed me to do that after I explained everything to them, I've got an obligation to them to do that and I will do that."  *Id.*

Graham said that a few days later, his paralegal got another call from Ms. Swanberg.  *Id.*  She said she had contacted Congressman Boyd and had lobbied him to change the law under which Defendant was convicted.  *Id.*  She called to ask whether the absence of an appeal by Defendant would adversely affect him if the law were to be changed.  *Id.*, p. 191.  Graham said he told his paralegal to tell Ms. Swanberg that if Defendant had changed his mind about whether to file an appeal, to call him (Graham) immediately.  *Id.*  He also told his paralegal to advise Swanberg to call Jeff Whitton, a "well known appellate lawyer here in Bay County" for the answer to the particular question.  *Id.*

Graham said that he went to all of the "debriefings" with the officers at the Jackson County Jail, and called Mr. Knight "numerous times about that cooperation." *Id.*, p. 282.  Graham said that early on, Defendant was not interested in cooperating. *Id.*, p. 248.  He said that when cooperation began, Defendant "oftentimes would want to play games with the officers and would not disclose all of the information that he had . . . ."  *Id.*  Graham said that "later on when we would talk about it, [Defendant] would indicate he was holding back information to use at a later time."  *Id.*, p. 194.  *See also* p. 279.  Graham said that the officers with whom Defendant was trying to cooperate "cornered me and told me they didn't think [Defendant] was being forthright with them on some issues."  *Id.*, p. 194.  Graham said he would have "heated" discussions about this, advising Defendant to be completely forthright and tell all he knew.  *Id.*, pp. 193-194.  Graham said:  "Ultimately they were unable to go far enough with that information to develop an indictment and charge people.  And because of that, Mr. Knight did not issue the 5K1 letter."  *Id.*, pp. 279-280.

Graham said that he talked with Knight about Swanberg providing assistance to law enforcement for Defendant, and the problem was that this required approval "high up the chain of command, to allow that to happen." *Id.*, p. 182.  Graham said he "hooked her up with Mr. Duncan and Mr. Finch and she worked with them, and I was out of the loop on that." *Id.*, p. 280.

Graham said that he "knew that Mr. Truette was involved in the drug trade in Washington County and was cooking meth and had a lot of customers, and I knew that that's the kind of stuff that DEA and the Washington County Sheriff's Office would love to have . . . ." *Id.*, p. 248.  Graham said Defendant had been in the drug trade "for at least five or six years . . . was cooking meth and had numerous customers." *Id.*, p. 249.  Graham was shown the part of the plea colloquy where Defendant told the court that he possessed the methamphetamine solely for recreational use.  Graham said: "[T]hat's not what he told me.  He told me that he was selling the stuff. . . .  He told me he was selling it." *Id.*, p. 265.

**Julie Ann Miller**

Ms. Miller is employed as a paralegal for Graham and was so employed during times relevant to this motion.  *Id.*, p. 300.  She denied that she was ever asked by Ms. Swanberg to file a notice of appeal for Defendant, but she said that she was contacted by Ms. Swanberg about an appeal.  *Id.*, pp. 300-301.  She said she told Graham, and Graham told her to tell Swanberg to tell Defendant that if he "would like an appeal, to please call him [Graham] and he would be happy to talk to him about it." *Id.*  After that, Defendant spoke with Graham, probably the same day.  *Id.*, p. 301.  On the following day, Swanberg called Miller to "make sure she knew what [Graham and Defendant] had

talked about," because Graham had informed her, and Swanberg told Miller "Okay, we're not filing an appeal because there's no grounds.  We're going to go on the cooperation and the legislative stuff that I'm working on."  *Id.*, p. 302.

Miller said that a few days later, Swanberg called her and told her she was trying to get some legislation through by talking with Congressman Boyd's office, but she was told that if Defendant did not file an appeal, "the legislative stuff that they were working on wouldn't mean anything."  *Id.*, p. 303.  Miller said that Swanberg's contact with her that day was "to inquire whether or not an appeal had to be filed in order to have any legislation affect Mr. Truette."  *Id.*  Miller told Graham about the call, and he told Miller to tell Swanberg that if he had changed his mind, to "give us a call, but if all she had was a question, which is what it sounded like when she asked the question, if all she had was a question about appeals, that she should contact Jeff Whitton," a local attorney "that does a lot of appeals."  *Id.*  Miller said that after that, she spoke with Swanberg and asked if she had ever talked with Mr. Whitton, and she told Miller that Defendant was not going to worry about that, that he was going to "worry about cooperation."  *Id.*, p. 304.  Miller said she would have immediately talked with Graham if either Swanberg or Defendant had told her he wanted an appeal filed, but she would not have drafted a notice of appeal with Graham's direction.  *Id.*, p. 305.

**Findings of fact**

Defendant's testimony during the § 2255 hearing was evasive in much the same way as during the plea colloquy.  Defendant seemed unable to confront and acknowledge the truth, and his equivocations resulted in testimony at the hearing that cannot be credited.  For example, Defendant said that there was "no way" that he could

have tested positive for methamphetamine use, but then said that he was a very heavy user of methamphetamine at the time of his arrest, a few months later.  He said he did not like to carry a large amount of methamphetamine with him because he did not like to share with others, but he admitted that he carried 16 heat-sealed packages of a user (small) quantity of methamphetamine in the tool box of his truck.  Defendant claimed that these packages were locked inside the tool box in the back of his truck but he said he had forgotten he had a key to the tool box.  None of this makes any sense.  Sixteen separately heat-sealed packages of methamphetamine seems more than necessary to provide the occasional "emergency" use, the packaging was unnecessary if it was possessed only for personal use, and if it was carried for emergency personal use, Defendant would not have forgotten that he had the key to the locked tool box where it was carried.

Moreover, Defendant's testimony was contradicted by Graham.  Graham said that Defendant told him that he had been selling drugs for a number of years and had a lot of customers.  It was this evidence (that Defendant had useful information about the criminal activity of others) that caused Graham to advise Defendant to cooperate and, by that means, avoid the minimum mandatory consecutive sentences.  The motion to suppress would not succeed, as will be explained ahead, and Defendant came to realize that pursuit of that very weak motion would simply alienate the officers who might speak in favor of him at sentencing if he were to cooperate.

These findings ineluctably lead to the finding that Defendant did not tell Graham to file an appeal for him.  Graham advised Defendant that he had no issues to present on appeal, and, realizing that was true, Defendant decided to pursue relief by

cooperation.  Cooperation was a very good strategy right after sentencing since Defendant had told Graham that he had been selling drugs for a number of years. Pursuit of a meritless appeal was contrary to the much better strategy of trying to obtain sentence relief through cooperation with law enforcement.

Graham's testimony, that Defendant tried to withhold information during the cooperation period, is consistent with the equivocations I observed in court and have read in the plea colloquy.  It is reasonably believable that Defendant tried to minimize his own role by failing to come forward with information and thus failed to earn a substantial assistance motion.

Ms. Swanberg's testimony, that Sergeant Hutching called her on Defendant's cellphone to ask her what she wanted to be done with her child at the scene of the arrest is credited. The testimony is the only competent evidence in the record on this subject.

**Defendant's claims**

**Grounds One, Seven, part of Eight, and Nine**

As Ground One, Defendant alleges that at the plea, "the judge stated that the charges 'could' be run consecutive."  Doc. 41, p. 3; p. 3  on the electronic case filing docket (ECF).  Defendant asserts:

> As soon as the judge finished reading the charges I asked my attorney about this and he stated:  "This is just procedure that the judge must do by law, for me not to worry that he has spoken with the government and the max that I would receive at the actual sentencing would be 30-years."  Thus my attorney was ineffective when in fact he should have objected and stated this for the record to ensure his promise to me that all I would receive is 30 years total.

*Id.*, pp. 3-3.1; pp. 3-4 on ECF.  Defendant asserts that this was ineffective assistance of counsel.

Defendant repeats this claim in Ground Seven.  He alleges that his guilty plea was coerced because his attorney promised that the most he would receive is a 30 year prison sentence.  *Id.*, p. 4.1; p. 6 on ECF.  He repeats this as part of Ground Eight, arguing that his attorney promised him a sentence of no more than 30 years and breached that "covenant."  *Id.*, p. 4.2; p. 7 on ECF.  He repeats this as Ground Nine, arguing that his plea was an "involuntary confession" because his attorney promised a sentence of no more than 30 years and threatened that if he took the case to trial he would be sentenced to life in prison.  *Id.*, p. 4.2.; p. 7 on ECF.

Ineffective assistance of counsel claims are governed by Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

In the context of a guilty plea, the first part of the Strickland test is the same, but "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); Gordon v. United States, 496 F.3d 1270, 1277 (11th Cir. 2007), *quoting*, Hill.  Further, in a challenge to a guilty plea under § 2255:

> [T]he representations of the defendant, his lawyer, and the prosecutor at
> [the plea] hearing, as well as any findings made by the judge accepting
> the plea, constitute a formidable barrier in any subsequent collateral

> proceedings.  Solemn declarations in open court carry a strong
> presumption of verity.  The subsequent presentation of conclusory
> allegations unsupported by specifics is subject to summary dismissal, as
> are contentions that in the face of the record are wholly incredible.

Blackledge v. Allison, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)

(citations omitted); *see also* United States v. Gonzalez-Mercado, 808 F.2d 796, 799-800

and n. 8 (11th Cir. 1987) (while not insurmountable, there is a strong presumption that

statements made during a plea colloquy are true, citing Blackledge and other cases).

The Court in Blackledge noted that where specific inquiry was made of the defendant,

his counsel, and the prosecutor, and the entire proceeding was transcribed verbatim, a

later contention that statements in the proceeding were untruthful would require an

evidentiary hearing "only in the most extraordinary circumstances."  431 U.S. at 80, n.

19, 97 S.Ct. at 1632, n. 19; Lasiter v. Thomas, 89 F.3d 699, 702-703 (10th Cir.), *cert.*

*denied*, 519 U.S. 998 (1996) (quoting Blackledge).

       In this case, the premise for the claims of ineffectiveness has no foundation in

fact.  Defendant's testimony is directly contradicted by the plea colloquy, a "formidable

barrier."  Blackledge.  While the plea agreement and the court did not directly state that

the minimum mandatory sentence, after application of mandatory consecutive features,

would be 45 years, that was a reasonable interpretation from both the plea agreement

and the court's explanation at the plea colloquy.  More important, Graham repeatedly

advised Defendant that he faced a minimum mandatory prison term of 45 years unless

he obtained a lesser sentence through cooperation.  Graham did not tell Defendant that

his *maximum* sentence would be 30 years.

Nor did Graham tell Defendant that he would be sentenced to life in prison if he did not plead guilty.  But even if he had, Defendant has not shown that such advice was attorney error because Defendant has not shown that "no reasonable lawyer, in the circumstances, would have" so advised a client.  Gordon v. United States, 518 F.3d 1291, 1301-1302 (11th Cir. 2008), *quoting*,  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir.1994).  Defendant faced a possible sentence of life in prison on counts 1, 2, 3, and 4, and 29 explosive devices were found on his property.  Defendant has not shown that a life sentence was not among the possible outcomes after a trial.  Grounds One, Seven, this part of Eight, and Nine are without merit.

**Grounds Two, Three, Five, Six, and part of Eight**

Defendant contends in Ground Two that his attorney was ineffective for failing to file a notice of appeal from the sentence.  Defendant alleges:

> Immediately after sentencing of my case I instructed my attorney to file a notice of appeal due to me being sentenced to 45 years when I was promised by my attorney that I would only receive 30 years.  My attorney stated that he would not file a notice of appeal stating my sentence was not illegal when in fact he [p]romised that I would receive 30 years and not the 45 that I did receive.

*Id.*, p. 3.  The alleged failure of Graham to file an appeal is also the basis for Grounds Three, Five, Six, and part of Eight (breach of "covenant" to file an appeal).  *Id.*, pp. 4-4.1; pp. 5-6 on ECF.

A claim that counsel failed to file a notice of appeal is determined by application of the Strickland formula.  Roe v. Flores-Ortega, 528 U.S. 470, 477,120 S.Ct. 1029, 1034, 145 L.Ed.2d 985 (2000).  The issue of whether counsel was ineffective for failing to file a notice of appeal, like all other Strickland questions, "will turn on the facts of a

particular case."  528 U.S. 477, 120 S.Ct. 1034-1035 (citation to Strickland omitted).

"[A] lawyer who disregards specific instructions from the defendant to file a notice of

appeal acts in a manner that is professionally unreasonable." Id., 120 S.Ct. at 1035.

"[W]hen counsel fails to file a requested  appeal, a defendant is entitled to [a new]

appeal without showing that his appeal would likely have had merit."  Id., quoting,

Peguero v. United States, 526 U.S. 23, 28, 119 S.Ct. 961, 143 L.Ed.2d 18 (1999).

> In those cases where the defendant neither instructs counsel to file an
> appeal nor asks that an appeal not be taken, we believe the question
> whether counsel has performed deficiently by not filing a notice of appeal
> is best answered by first asking a separate, but antecedent, question:
> whether counsel in fact consulted with the defendant about an appeal.
> We employ the term "consult" to convey a specific meaning – advising the
> defendant about the advantages and disadvantages of taking an appeal,
> and making a reasonable effort to discover the defendant's wishes.[6]  *If
> counsel has consulted with the defendant, the question of deficient
> performance is easily answered:  Counsel performs in a professionally
> unreasonable manner only by failing to follow the defendant's express
> instructions with respect to an appeal. . . .  If counsel has not consulted
> with the defendant, the court must in turn ask a second, and subsidiary,
> question:  whether counsel's failure to consult with the defendant itself
> constitutes deficient performance*.

Id. at 478, 120 S.Ct. at 1035 (emphasis added).

The failure to file an appeal claims are factually without merit.  Graham consulted

with Defendant and advised him that he did not have any issues to present on appeal.

As will be discussed ahead, Defendant has not shown that that advice was erroneous.

Further, as a matter of fact, Defendant decided not to file an appeal and to pursue a

substantial assistance motion instead.  For these reasons, Grounds Two, Three, Five,

Six, and this part of Eight are without merit.

---

[6] Although the Court did not say so, it would seem logical that attorney error as
defined by Strickland could occur in the course of this consultation.

**Ground Four**

Defendant contends in Ground Four that his lawyer was ineffective for failing to "discuss with me any enhancements."  *Id.*, p. 4; p. 5 on ECF.  This refers to the enhancements of penalties due to prior drug convictions.

Defendant cannot show prejudice to the outcome, even if his attorney did not speak to him about sentencing enhancements due to prior drug convictions.  The information about the enhancements was in the plea agreement.  Doc. 16, p. 2.  Defendant discussed the plea agreement with Graham, and he had it for several hours before the plea.  At the plea colloquy, the court asked Defendant whether he understood that he faced a minimum mandatory prison term of 10 years on counts 1 and 2 due to his prior felony drug convictions, and Defendant twice said "Yes, Ma'am."  Doc. 55, pp. 12-13.  Ground four is without merit.

**Ground Ten**

In Defendant's supplement, doc. 59, he asserts that his attorney was ineffective for failing to conduct a meaningful pretrial investigation.  He asserts that his attorney should have discovered the testimony of his probation officer, Canoy, that the charge of violation of probation was based upon an unreliable urine sample.  Doc. 59, pp. 1-3.  He argues that his attorney was ineffective because his arrest was invalid, and, as a consequence, a motion to suppress the evidence from both the truck and the his residence should have been successful.  *Id.*

Attached to the supplement is the affidavit of Melvin Joel Canoy.  Doc. 59, Ex. A; p. 10 on ECF.  Mr. Canoy states that he was employed by the Florida Department of

Corrections from 1989 to 2006 as a Probation Officer, and part of his duties was to collect random urine samples from probationers.  *Id.*, p. 10.  He states that at times, several probationers would be in the room where samples were collected with samples waiting to be tested.  *Id.*  Some of the samples were held by the probationers, and some were placed on a table beside samples of other probationers.  *Id.*  The key to the refrigerator (where presumably samples were stored) was hanging inside a cabinet that contained supplies.  *Id.*  The room was not locked and the front door lobby that led to this room "was not locked the majority of the time."  *Id.*  Canoy expresses the opinion from this evidence that it was possible for the urine samples to have become tainted.  *Id.*  He states that Defendant was one of his probationer's and his urine sample "could have been tainted."  *Id.*

Canoy did not testify at the evidentiary hearing.[7]  Canoy's affidavit is hearsay, and insufficient to prove that the drug test was faulty.

But even if there was competent evidence that the drug test was flawed, there is no evidence that the judge that issued the arrest warrant for violation of probation knew that the test was faulty, or, more important, that Sergeant Hutching had reason to believe that the warrant was invalid.  Hence, Defendant did not have a viable Fourth Amendment claim to make.  United States v. Leon, 468 U.S. 897, 922, 104 S.Ct. 3405,

---

[7] Perhaps Mr. Canoy was not called as a witness due to his subsequent problems.  The Government filed a letter dated March 14, 2006, to Mr. Canoy dismissing him as a correctional probation officer for unlawfully and knowingly using his "authority and control as a Correctional Probation Officer to cause a female probationer under your supervision to perform sexual acts upon you," and threatening the probationer with violation of probation if she did not.  Doc. 65, pp. 7-8.  There is also a warrant for the arrest of Mr. Canoy dated March 13, 2006.  *Id.*, p. 10.  Canoy entered a nolo contendere plea on August 15, 2006.  *Id.*, p. 14 (administrative petition to impose a penalty dated December 5, 2006).

3420, 82 L.Ed.2d 677 (1984) ("We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.").  Consequently, Defendant has not shown either attorney error or prejudice to the outcome in the "failure" of his attorney to discover the evidence from Canoy.

Defendant's current counsel (appointed for the evidentiary hearing) has now also argued that Graham was ineffective failing to investigate whether the explosive device that was the subject of counts 4 and 5 was actually an explosive device.  The argument arises from the fact that the Government's expert decided that there was not enough evidence to say that the device that was the subject of counts 6 and 7 was an explosive device.  Doc. 92, p. 16.

Counsel for Defendant did not file a motion to amend the § 2255 motion to bring this claim.  Even if amendment were permitted at this late date,[8] Defendant has not shown prejudice to the outcome.  Defendant has come forward with no evidence to show that the device that is the basis for the guilty plea to counts 4 and 5 was not an explosive device.  Graham testified that Defendant told him how he constructed the devices, and, therefore, Graham had a reasonable grasp of the potential for there being a useful line of investigation here.  Moreover, the only reason that for the lack of evidence that the device that was charged as counts 6 and 7 was an explosive device was that it was blown up and too little remained to provide such evidence.  Finally, 29 devices were found.  Even if Graham could have shown that the device charged as

---

[8] The issue, which need not be decided here, is whether such an amendment would relate back so that the amended claim may be deemed to have been timely filed within the one year period for filing a § 2255 motion.

counts 4 and 5 was not an explosive device, it is likely that the Government would simply have substituted another device for counts 4 and 5.  For all of these reasons, Ground Ten is without merit.

**Ground Eleven**

Defendant contends that the search warrant was not based upon probable cause.  Doc. 59, p. 4.  Defendant asserts that his attorney was ineffective because he abandoned the motion to suppress as to the search of his home.  *Id.*

Defendant argues that Sergeant Hutching "never states in his affidavit [for the search warrant] what probable cause lead [sic] him to search petitioner's home after petitioner had been taken to jail, notwithstanding the initial traffic stop had taken place some 18 miles away from petitioner's residence, it was wholly unreasonable for counsel to withdraw the motion to suppress," citing Strickland.  *Id.*, pp. 4-5.  Defendant also contends that the motion to suppress should not have been abandoned because Sergeant Hutching's affidavit falsely stated that Defendant arrested two years earlier for possession of methamphetamine.  *Id.*, p. 5.  Defendant argues that Hutching's statement was in reckless disregard for the truth, citing Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).  *Id.*

A successful motion to suppress is a necessary predicate to this claim faulting counsel for failure to file such a motion.  Kimmelman v. Morrison, 477 U.S. 365, 382, 109 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986).  Further, Franks held that when the veracity of a sworn statement used by law enforcement officers to obtain a search warrant is challenged and an evidentiary hearing is found to be warranted, the burden is upon the challenging defendant to prove that the statements contained therein were

"deliberate falsehood[s]" or made in "reckless disregard for the truth."  438 U.S. at 171,

98 S.Ct. at 2684.  Even if a "deliberate falsehood" is proved, that does not end the

matter:

> To justify suppression of evidence seized under a warrant, the alleged
> deliberate or reckless failure to include material information in the affidavit
> must conceal information that would defeat probable cause.  *See United
> States v. Cross*, 928 F.2d 1030, 1040 (11th Cir.1991); *see also United
> States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir.1990) (Minor or
> immaterial omissions from the affidavit will not invalidate a warrant where
> the omitted information, if furnished, would not have precluded a finding of
> probable cause.).

United States v. Steiger, 318 F.3d 1039, 1046 (11th Cir.), *cert. denied*, 538 U.S. 1051

(2003).[9]

For purposes of this motion it is found to be true that on the day of Defendant's

arrest, Ms. Swanberg, on her cellphone, talked with Sergeant Hutching on Defendant's

cellphone.  She told Sergeant Hutching that she was in Biloxi, that he had her

permission to release her child to Defendant's aunt and uncle, and that she was coming

to get the child.  Sergeant Hutching, however, had no firm evidence that Swanberg was

in fact in Biloxi.  She was talking on her own cellphone and could have been anywhere.

Defendant was in possession of a methamphetamine pipe, a small quantity of

methamphetamine in the cab of his truck, and 16 separately heat-sealed packages of

methamphetamine.  He was wanted on a violation of probation warrant for testing

positive for methamphetamine use several months earlier, so Hutching had good

_____

[9] After disregarding any deliberate falsehood or those portions of the affidavit for
which the affiant was reckless in disregard for the truth, if "the affidavit's remaining
content is insufficient to establish probable cause, the search warrant must be voided
and the fruits of the search excluded to the same extent as if probable cause was
lacking on the face of the affidavit."  Franks, 438 U.S. at 156, 98 S.Ct. at 2676.

reason to believe that Defendant's involvement with methamphetamine was continuous. The packages of methamphetamine reasonably gave rise to probable cause to believe that Defendant was making methamphetamine.  Methamphetamine is commonly made at a person's residence, and the process by which it is made is extremely dangerous to others.[10]  Hutching knew that Defendant and Swanberg had a relationship.  If Swanberg was not in Biloxi, and if she were involved in Defendant's methamphetamine manufacturing business, then Hutching had two important reasons immediately to go to Defendant's home.  The first was to secure the premises so that law enforcement officers could apply for a search warrant and so that other persons, including Swanberg, would not have a chance to destroy evidence.  Secondly, if Swanberg was mixed up in the methamphetamine business with Defendant, Hutching had a duty to protect her child and not allow her to take custody of her child.  It was completely reasonable for Sergeant Hutching to drive 20 miles – or more – to knock on the door of Defendant's home to see if anyone was there.

Moreover, in the course of an investigation, there is nothing wrong with a law enforcement officer approaching a residence without a search warrant to question the occupants:

> Reasonable suspicion cannot justify the warrantless search of a house, *see Arizona v. Hicks*, 480 U.S. 321, 328, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987), but it can justify the agents' approaching the house to

---

[10] The Sentencing Guidelines provide for a sentence enhancement where the manufacture of methamphetamine creates a substantial risk of harm to human life or the environment, or where a minor is present, and a greater enhancement for the life of a minor or incompetent.  U.S.S. G. § 2D1.1(b)(6)(B) and (C) (2004); § 2 D1.1(b)(10)(C) and (D) (2007) (renumbering the sections).

question the occupants.  *Knight*,[11] 451 F.2d at 278; *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964) (stating "[a]bsent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.").

United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir.), *cert. denied*, 502 U.S. 907 (1991).  Defendant's property was not completely fenced off and lacked any "no trespassing" signs.  Further, the use of a flashlight to look into an area does not undermine the Government's potential use of the "plain view" doctrine.  United States v. Purvis, 768 F.2d 1237, 1238 (11th Cir. 1985), *cert. denied*, 475 U.S. 1011 (1986).  *See also*, United States v. Desir, 257 F.3d 1233, 1236 (11th Cir. 2001) ("Moreover, the crack cocaine was in plain view when Officer Davis shined his flashlight through the windshield of Desir's car.  Under the plain view doctrine, this was a sufficient alternative basis for the district court's denial of Desir's motion to suppress."); United States v. Lara, 517 F.2d 209, 211 (5th Cir. 1975).

Defendant argues that Sergeant Hutching falsely stated in his affidavit that he had been previously convicted of a methamphetamine offense.  It is true, on this record, that this assertion was wrong.  Defendant had previously been convicted of cultivation of marijuana, and had twice been convicted of possession of cocaine.  There is no competent evidence, however, that he had ever been arrested for, or convicted of, a methamphetamine offense.  Defendant has not, however, shown that Sergeant

---

[11] United States v. Knight, 451 F.2d 275, 278 (5th Cir.1971), *cert. denied*, 405 U.S. 965 (1972).

Hutching deliberately or recklessly used this false information in his affidavit. Sergeant

Hutching was not called as a witness to explain how he came to that conclusion.

Moreover, even if this information were excluded, the remaining evidence was sufficient

to provide probable cause for a search of Defendant's residence. For all of these

reasons, Ground Eleven is without merit.

**Ground Twelve**

Defendant contends that as a result of the Supreme Court's decision in Lopez v.

Gonzales, 549 U.S. 47,127 S.Ct. 625, 166 L.Ed.2d 462 (2006), his prior convictions for

simple possession of cocaine and less than 20 grams of marijuana should not have

counted as qualifying offenses pursuant to 21 U.S.C. § 841(b)(1)(B)(viii) to enhance his

sentences for counts 1 and 2. Doc. 59, pp. 6-8. Defendant contends that the state

offenses were misdemeanors under the Controlled Substances Act. *Id.*, 6. The

Government addresses the merits of this supplemental claim. Doc. 65, pp. 3-4; doc. 93,

pp. 10-11.

This court should not reach the merits of this claim. Lopez does not apply

retroactively on collateral review. United States v. Carroll, 2007 WL 1299334, *8-9

(N.D. Fla. Apr. 30, 2007) (No. 5:06cr42-MCR/MD).

But even if the Lopez case were to be applied retroactively on collateral review, it

does not compel the result argued by Defendant.

> The key distinction between *Lopez* and the instant case is that the
> definition of a felony drug offense is not tied to the Controlled Substances
> Act. Rather, the term "felony drug offense" is defined as "an offense that
> is punishable by imprisonment for more than one year under any law of
> the United States *or of a State*." 21 U.S.C. § 802(44)(emphasis supplied).
> Because Defendant was convicted of a drug offense punishable as a

felony by the state, it qualifies to enhance Defendant's sentence under 21 U.S.C. § 841(b)(1)(A).

United States v. Winningham, 2007 WL 1308673, *2 (N.D. Fla. May 3, 2007) (No.

1:01-cr-39-MP/AK) (emphasis added).  Ground Twelve is without merit.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's § 2255 motion, doc. 41, as

supplemented, doc. 59, be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on June 6, 2008.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**